Jeremy J. Alberts, State Bar No. 273290
Batkhand Zoljargal, State Bar No. 262918
THE ALBERTS FIRM
1600 N. Broadway, Suite 1010
Santa Ana, CA 92706-3927
Telephone: (714) 441-1144; FAX: (714) 574-7633
bzoljargal@albertsfirm.com

Attorneys for Plaintiffs,
Manoj Rijhwani and Lisa Rijhwani

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANOJ RIJHWANI, an individual, and LISA RIJHWANI, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> WELLS FARGO HOME MORTGAGE, INC., a division of WELLS FARGO BANK, N.A., a National Association; and DOES 1-100, inclusive, <br><br> Defendants. | Case No.: 3:13-CV-05881-LB <br><br> *Assigned to Hon. Laurel Beeler* <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date:    February 20, 2014 <br> Time:    9:30 a.m. <br> Ctrm.:   C (15th Floor) |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Plaintiffs Manoj Rijhwani and Lisa Rijhwani ("Plaintiffs") by and through their

attorneys of record hereby oppose Motion to Dismiss Second Amended Complaint

---
**-1-**
**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

filed by Defendant Wells Fargo Bank, N.A., successor by merger with Wells Fargo Bank Southwest, N.A., f/k/a Wachovia Mortgage, FSB, f/k/a World Savings Bank, FSB (erroneously sued as Wells Faro Home Mortgage, Inc.) ("Wells Fargo"). This Opposition is based on Memorandum of Points and Authorities in support thereof, all the papers on file with the Court, and any arguments made by Plaintiffs' counsel at the hearing currently scheduled for this matter.

DATED: January 23, 2014                          THE ALBERTS FIRM


                                        By:      */Batkhand Zoljargal/*
                                                 Jeremy J. Alberts
                                                 Batkhand Zoljargal,
                                                 Attorneys for Plaintiffs,
                                                 Manoj Rijhwani and
                                                 Lisa Rijhwani

# TABLE OF CONTENTS

I.     INTRODUCTION .............................................4

II.    STATEMENT OF FACTS ..............................................4

III.   LEGAL ARGUMENT……………………………………….........13

       A. STANDARD FOR DISMISSAL UNDER FEDERAL RULE OF CIVIL
          PROCEDURE 12(b)(6) ....................................................13

       B. PLAINTIFFS' CLAIMS ARE NOT BARRED BY HOLA………..14

       C. THE SECOND AMENDED COMPLAINT STATES A CLAIM FOR
          VIOLATION OF CAL. CIV. CODE § 2923.6……………….........17

       D. THE SECOND AMENDED COMPLAINT STATES A CLAIM FOR
          PROMISSORY ESTOPPEL……………………………………..19

       E. THE SECOND AMENDED COMPLAINT STATES A CLAIM FOR
          NEGLIGENCE……………………………………………….…..22

IV.    CONCLUSION .............................................25

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Through the instant lawsuit, Plaintiff Manoj Rijhwani and Plaintiff Lisa Rijhwani ("Plaintiffs") will establish that Defendant Wells Fargo Bank, N.A., successor by merger with Wells Fargo Bank Southwest, N.A., f/k/a Wachovia Mortgage, FSB, f/k/a World Savings Bank, FSB (erroneously sued as Wells Faro Home Mortgage, Inc.) ("Wells Fargo") promised not to foreclose during loan modification process but did foreclose on Plaintiffs' real property located at 1044 Rudder Lane, Foster City, California 94404 ("Property" or "Subject Property").

Plaintiffs have sufficiently pled both plausible factual allegations, as well as legal claims, to enable their Second Amended Complaint ("SAC") to move forward. This is not the phase in litigation to weigh the merits of the case.  In reviewing the sufficiency of the claims asserted, the issue is not whether Plaintiffs will ultimately prevail, but whether the Plaintiffs are entitled to offer evidence to support the claims asserted.   *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

## II.    STATEMENT OF FACTS

On or about July 5, 2007, Plaintiffs entered into a consumer loan transaction with World Savings Bank, FSB ("World Savings") to refinance a single family property located at 1044 Rudder Lane, Foster City, California 94404 ("Subject Property").  As part of the transaction, Plaintiffs executed a Promissory Note in favor of World Savings and granted the latter a security interest in the Subject Property in the form of a Deed of Trust, recorded with the San Mateo County Recorder's Office on or about July 11, 2007. SAC ¶ 11.

Plaintiffs are informed, believe and thereon allege that, subsequent to this transaction, the beneficial interests in the Promissory Notes underlying Plaintiffs' first mortgage with World Savings (Wachovia Mortgage Loan 0012665501 ("First

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Loan")) and second mortgage with World Savings (Wachovia Home Mortgage Equity Line of Credit 0046507539 ("Second Loan")), later acquired by Wachovia Mortgage, FSB ("Wachovia"), were sold and/or transferred, to Wells Fargo in late January of 2012; the servicing of both loans was thereafter undertaken by Wells Fargo. SAC ¶ 12.

Plaintiffs were in default under their first loan in 2011 and, in an earnest attempt to prevent an impending foreclosure and thereby remain in lawful possession of the subject property decided to avail themselves of Wells Fargo's available foreclosure avoidance programs.  Discussions took place in September 2011 with Sean Martin, a Wachovia representative who apprised them of the upcoming transfer of their loans to Wells Fargo, Contact No. (877) 859-1861.  After learning of their financial situation, Mr. Martin advised Plaintiffs that a new loan modification program was being instituted and that, until it was in place, Plaintiffs should refrain from paying toward their second loan and await the enrolment information.  No such enrolment information was forthcoming; moreover, after this conversation with Mr. Martin, both Wachovia and Wells Fargo ceased sending Plaintiffs monthly statements with respect to either of their loans. SAC ¶ 13.

Because their second loan's regular monthly payment was between $200.00 and $300.00, Plaintiffs would have had no difficulty making it; as such, Plaintiffs' primary intention was to bring that loan current and have the payment terms of the first loan modified.  At that point, Plaintiffs had already made numerous attempts with various Wells Fargo representatives to cure the second loan's arrearages, but because they were no longer receiving monthly statements, the exact amount in default was unknown; moreover, Plaintiffs were never provided with a straight answer from any of these representatives.  Plaintiffs' concerns in this respect were made clear to a Wells Fargo representative named "Armando" (Employee ID:  NVD)

in a February 27, 2012 phone call, wherein they provided information regarding their household income and current monthly expenses, as part of Wells Fargo's Home Affordable Modification Program ("HAMP") "pre-qualification process." SAC ¶ 14.

Despite these discussions, the following day, February 28, 2012, Defendants recorded and issued a Notice of Default under Plaintiffs' second mortgage loan in the amount of $4,023.90.  SAC ¶ 15.

Plaintiffs' continuing desire to bring their second loan current was reiterated in a phone conversation with a Wells Fargo representative named "Reggie" (Employee ID:  667862) on March 3, 2012.  Reggie stated that Plaintiffs would need to pay $2,000.00 to do so, but advised them to wait, because the specialist who would ultimately be assigned to their case would be making the decisions as to the "next steps" in the process, as well as on any issues regarding payment. SAC ¶ 16.

On March 14, 2012, Plaintiffs were contacted by a Wells Fargo representative named "Holly," (Employee ID: 8HA) who informed them that they had been qualified for assistance under HAMP, and that a specialist would soon be assigned to their case.  Plaintiffs nonetheless inquired when they could begin making payments toward their second mortgage; Holly responded that their specialist, once assigned, would "make those decisions." SAC ¶ 17.

Plaintiffs yet again made clear their desire to bring the second loan current, and to only have their first loan considered under HAMP, in a phone conversation with a Wells Fargo employee named "Arleen" (Employee ID: ABJ) on April 16, 2012. Arleen informed them that a specialist would be assigned within 48 hours and that they would be working with him or her on "which loan to be modified." SAC ¶ 18.

Plaintiffs were finally assigned a "Home Preservation Specialist" named Juan Teran on April 18, 2012 at (877) 859-1860, ext. 54935.  Mr. Teran spoke with Plaintiffs, ostensibly to gain insight into their particular financial situation; after

conducting a brief interview, he confirmed that they qualified for a loan modification under HAMP. SAC ¶ 19.

During this phone conversation, Mr. Teran instructed Plaintiffs not to make payments on either of their loans until he had a clear picture of their situation, despite Plaintiff's demonstrated ability and willingness to, at the very least, continue paying toward their second mortgage, thereby bringing it current. SAC ¶ 20.

In a phone conversation with Mr. Teran on April 24, 2012, Plaintiffs stated that their monthly expenses would be reduced by $1,500, given that their daughter would be moving from private to public school.  In light of their improved situation, Plaintiffs reminded Mr. Teran of their intention to bring their second mortgage account current, expressing their current financial ability to do so.  Nevertheless, Mr. Teran reiterated his previous advice, namely, that Plaintiffs refrain from making any mortgage payments, for the reason that the principal amount on both loans would be reduced and that the two loans might ultimately be combined.  Mr. Teran further informed Plaintiffs that he would contact them soon to provide them with the forms necessary to submit their HAMP application. SAC ¶ 21.

However, Plaintiffs did not receive any forms, nor could they make contact with Mr. Teran, or any other Wells Fargo representative familiar with their file, until May 8, when Mr. Teran assured that no foreclosure sale would be conducted during Plaintiff's HAMP evaluation.  A letter from Mr. Teran, dated May 15, reiterated this assurance; Plaintiffs were informed in a later conversation on May 17 that they were indeed eligible for HAMP modification, and that the necessary forms were forthcoming. SAC ¶ 22.

As before, no forms were sent or received; moreover, on June 15, 2012 – three weeks after their last conversation with Mr. Teran – Plaintiffs discovered a Notice of Trustee's Sale posted on their door, such sale scheduled for June 20.  Plaintiffs

immediately contacted Mr. Teran on June 18 to express their concerns.  They were informed not to worry because the sale would be postponed; again, Mr. Teran instructed Plaintiffs not to make any mortgage payments, this time, for the reason that Wells Fargo could not decide how much these payments would be, nor had their modified interest rate been established. SAC ¶ 23.

The next day, June 19, Plaintiffs' numerous calls to Mr. Teran went unanswered; however, early on the morning of June 20, Plaintiffs successfully contacted Mr. Teran.  To Plaintiffs' relief, he confirmed that the Trustee's Sale had been postponed to August 7, 2012.  He further represented that Plaintiffs should ignore any further notices from Regional Trustee Services Corporation ("Regional"), as this company was "just a formality from Wells Fargo," that he, not the Trustee, was the "primary decision maker," and that as long as they continued to work with him, "nothing [would] happen to [their] home." SAC ¶ 24.

Per Mr. Teran's request, Plaintiffs faxed their most recent pay stubs, along with their 2011 federal tax statements on June 22, 2012; receipt of these documents was confirmed on June 25.  The following week, Mr. Teran asked Plaintiffs to download, complete and submit electronic copies of a Request for Modification Affidavit ("RMA") and IRS Form 4506-T (Request for Transcript of Tax Return).  These completed documents were faxed and received on July 15, 2012; in the meantime, however, Plaintiffs received a letter from Mr. Teran with Wells Fargo's nearly identical versions of these two items.  In a phone conversation on July 30, Mr. Teran stated that he was still reviewing Plaintiffs' documents, and that the previously rescheduled Trustee's Sale had been postponed a second time, to October, 2012. SAC ¶ 25.

On August 7, 2012, Plaintiffs called Mr. Teran to confirm that the sale had been postponed; they were assured that this was in fact the case, and Mr. Teran

---

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

repeated his previous advice to ignore any future notices from Regional.  The next day, Mr. Teran asked Plaintiffs to again complete and submit Wells Fargo's previously mailed versions of the RMA and Form 4506-T.  They did so, and in a subsequent phone conversation, Mr. Teran requested Plaintiffs' most recent pay stubs in order to "submit [their] application."  These items were faxed and received on August 27, 2012. SAC ¶ 26.

In mid-September, Mr. Teran informed Plaintiffs that he "ha[d] all the information to submit [their] application," that he would do so "in the next couple of weeks," and that, based upon the underwriter's results, he would follow up with them within four to six weeks with Wells Fargo's determination.  Plaintiffs were also informed that the Trustee's Sale had been rescheduled, a third time, to December, 2012. SAC ¶ 27.

In early November, Plaintiffs, despite having left several voicemail messages at Mr. Teran's extension, received a call from a different Wells Fargo representative who curtly informed them that their HAMP application had not been submitted, and suggested that they contact Mr. Teran.  Plaintiffs were finally able to do so in early December, when Mr. Teran stated that he needed a Homeowners' Association Statement in order to submit the application, and that the Trustee's Sale had been postponed, for a fourth time, to January, 2013.  During this conversation, Plaintiffs inquired why, despite their clear eligibility for a modification, their home continued to be scheduled, and rescheduled, for sale.  Mr. Teran responded, quite plainly, that this was "just part of [the Wells Fargo] process to put pressure on homeowners to work with the Home Preservation Specialist and move the application process forward."  He also requested Plaintiffs' paystubs for the remainder of 2012, which they promptly submitted. SAC ¶ 28.

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Concerned, not only about the status of their application, but in addition, about the upcoming Trustee's Sale, Plaintiffs attempted to contact Mr. Teran, leaving detailed voicemail messages at his extension on January 10, 14, and 18, 2013.  When he eventually responded on the last of these dates, Mr. Teran requested that Plaintiffs revise and re-submit the RMA and 4506-T forms with January 2013 dates along with their most recent pay stubs, and stated – yet again – that once these items were received, he would submit their application and reschedule the Trustee's Sale, a fifth time, to April, 2013.  As before, Mr. Teran also reminded Plaintiffs to ignore any notices from Regional.  Plaintiffs promptly submitted the requested documents. SAC ¶ 29.

Plaintiffs contacted Mr. Teran again on February 4, 2013 to confirm his receipt of the items he requested; this, as well as the rescheduled sale date in April, was confirmed, and Plaintiffs were told to expect a final determination on their application before then.  In order to confirm that their application had actually been submitted, Plaintiffs attempted to contact Mr. Teran on February 15, 19, and 21, 2013; they were unable to leave any voicemail messages, as the mailbox was full and could not accept any new messages.  Plaintiffs were, however, able to leave a message on February 25, wherein they expressed their concerns. SAC ¶ 30.

Plaintiffs were finally able to speak to Mr. Teran again on March 1, 2013:  he informed them that there were "new versions" of the RMA and 4506-T forms, that these needed to be completed and submitted by fax, along with their most recent pay stubs and yet another Homeowners' Association Statement. SAC ¶ 31.

This same day, Plaintiffs discovered a Three Day Notice to Quit posted on their front door.  They immediately called Mr. Teran but, because his mailbox was again full, no voicemail message could be left.  On March 4, 2013 Plaintiffs were again

unable to contact Mr. Teran, but did manage to speak to a Wells Fargo representative named "Cecilia Gonzales," who was herself unable to contact Mr. Teran. SAC ¶ 32.

Plaintiffs were able to contact Mr. Teran the next day; he instructed them to "add 2010 and 2011 on line number 8 of the 4506-T form." When Plaintiffs informed him of the Three Day Notice, Mr. Teran expressed surprise, and assured them that he would follow up with Wells Fargo's Foreclosure Department to "reverse the sale" of their home. SAC ¶ 33.

Upon Plaintiff's insistence, Mr. Teran transferred them to this department, where Plaintiffs explained their plight to a Wells Fargo representative named "Maria Santiago" (Employee ID: 17S). Ms. Santiago expressed her sympathy in light of Plaintiffs' situation, and asked them to send a letter to the Foreclosure Department, which would "open an inquiry into [this] wrongful foreclosure." She also tried to contact Mr. Teran, but was unable to do so. SAC ¶ 34.

On March 11, 2013, receipt of Plaintiffs' letter was confirmed, not by Mr. Teran, as he could not be reached, but rather by a Wells Fargo representative named "Johnny Saz." Plaintiffs have since had no contact with Mr. Teran, or any other Wells Fargo representative to date. They did, however, receive two identical, form letters from Wells Fargo which stated, somewhat ironically, "Thank you for your recent inquiry on your Wells Fargo Home Mortgage loan. . .[w]e appreciate your business and are glad we can be of assistance. . .[w]e will provide you with a written response when we have completed our review." SAC ¶ 34.

Plaintiffs' residence was sold to a third party buyer following a Trustee's Sale conducted on March 1, 2013, at a winning bid of $231,600. As it turned out, the Sale had not, as Mr. Teran represented, been rescheduled for April. Had Plaintiffs known of the sale, they would certainly have attended and, because they were in a financial

position to place a competitive bid, they might very well have been able to repurchase the property, then and there. SAC ¶ 35.

As the above factual summary makes clear, over a year elapsed from the time Plaintiffs were first assured of their eligibility for a loan modification and the eventual foreclosure upon, and sale of, their family home.  Despite continually informing Plaintiffs that a modification was forthcoming, Mr. Teran, a Wells Fargo employee and a self-described "Home Preservation Specialist," appears to have never even submitted an application on their behalf, though he had eleven months within which to do so. SAC ¶ 36.

It must be emphasized that Wells Fargo serviced both of Plaintiff's loans and, as such, was empowered to foreclose upon either.  It was, therefore, in a unique position vis-à-vis the newly-enacted Homeowners' Bill of Rights ("HBR"), which centers upon, and makes unlawful, precisely the type of conduct alleged in the Second Amended Complaint. Plaintiffs were informed, believed and thereon alleged in their Second Amended Complaint that Wells Fargo elected to institute foreclosure proceedings with respect to the second of these loans, solely in order to circumvent the HBR and thereby escape any subsequent liability for its intentional, material violation.  The prolonged loan modification application process, initiated in early 2012, was undertaken with respect to both the first and second loans, such that as of January 2013, the HBR applied with full force. SAC ¶ 37.

Plaintiffs were never provided with a written denial of their request for a loan modification, nor were they afforded any opportunity to appeal its decision, if such a decision had been forthcoming.  All of this occurred, despite Plaintiffs' continued willingness to renegotiate the payment terms under the existing mortgage, their dutiful and timely submission of all requested documentation and – more importantly – in direct contravention of the assurances they were given. SAC ¶ 38.

## III.   LEGAL ARGUMENT

**A.**   **STANDARD FOR DISMISSAL UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

Motions to dismiss for failure to state a claim under Federal Rules of Civil Procedure, Rule 12(b)(6) are viewed with disfavor, and accordingly, dismissals for failure to state a claim are "rarely granted." *Gilligan v. Jamco Dev. Corp.,* 108 F.3d 246, 249 (9th Cir. 1997).  The standard for dismissal under Rule 12(b)(6) is a stringent one. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief." *See Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 811 (1993) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Cervantes v. City of San Diego,* 5 F.3d 1273, 1274 (9th Cir. 1993) (emphasis added).

The purpose of a motion under Federal Rule 12(b)(6) is to test the formal sufficiency of the statement of the claim for relief in the complaint. *See Rutman Wine Co. v. E. & J.Gallo Winery,* 829 F.2d 729, 738 (9th Cir. 1987).  The complaint must be construed in the light most favorable to the nonmoving party and its allegations taken as true. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).  In ruling on the motion, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party." *Vasquez v. L.A. Cnty.,* 487 F.3d 1246, 1249 (9th Cir. 2007). It is not a procedure for resolving a contest about the facts or the merits of the case.  In reviewing the sufficiency of the complaint, the issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support the claims asserted.  Furthermore, more recently, the U.S. Supreme Court has held that to survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, would "state a claim to relief that is plausible on its face." *See Bell Atlantic Corp. v. Twombly,* 55 US 544 (2007).

**B.    PLAINTIFFS' CLAIMS ARE NOT PREEMPTED BY HOLA**

The issue here is whether Plaintiffs' claims for violation of the California Homeowners' Bill of Rights, Promissory Estoppel and Negligence as stated in their Second Amended Complaint are pre-empted by the Home Owners' Loan Act ("HOLA"). Congress enacted the HOLA, 12 U.S.C. § 1461 (2006), to restore public confidence in federal savings banks and loan association. *See Silvas v. E*Trade Mortg. Corp.,* 514 F.3d 1001, 1005-06 (9th Cir. 2008).

The preemption doctrine is rooted in the Supremacy Clause of the U.S. Constitution. U.S. Const., art. VI, cl. 2. However, pre-emption analysis is not simple and Defendant Wells Fargo cannot just cite some cases and expect the court to agree with its statements. There is no case on point issued by the United States Supreme Court or by the Ninth Circuit Court of Appeals stating that California Homeowners' Bill of Rights is preempted by HOLA. But there is a plenty of guidance in other pre-emption cases. Courts seem to have taken into account several considerations.

First,"[p]re-emption should not be inferred ... simply because the agency's regulations are comprehensive." *R.J. Reynolds Tobacco Co.,* 479 U.S. at 149, 107 S.Ct. 499. Federal regulations have "to be sufficiently comprehensive to authorize and govern programs in States which [have] no requirements of their own as well as cooperatively in States with such requirements." *Hillsborough County, Fla. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 717, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (alteration and internal quotation marks omitted). As the Supreme Court stated, "merely because the federal provisions were sufficiently comprehensive to meet the need identified by Congress did not mean that States and localities were barred from identifying additional needs or imposing further requirements in the

field." *Id.* Only because the federal government decided to regulate lending through HOLA does not mean that the State of California was barred from identifying additional needs or impose further requirements on banks to protect borrowers in the difficult recession years following their predatory lending practices.

Second, the United States Supreme Court explained the method of determining pre-emption when it decided the pre-emptive effect of the Federal Cigarette Labelling and Advertising Act. *Cipollone v. Liggett Group, Inc., supra,* 505 U.S. at p. 523, 112 S.Ct. 2608. We "must fairly but—in light of the strong presumption against pre-emption—narrowly construe the precise language of [the preemptive statute or regulation] and we must look to each of [the plaintiffs' state] law claims to determine whether it is in fact pre-empted." *Cipollone,* pp. 523–524, 112 S.Ct. 2608. As to each state law claim, the central inquiry is whether the legal duty that is the predicate of the claims constitutes a requirement or prohibition of the sort that federal law expressly pre-empts. *Cipollone,* p. 524, 112 S.Ct. 2608. In other words, state law is "nullified to the extent that it actually conflicts with federal law." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). "Such a conflict arises when compliance with both federal and state regulations is a physical impossibility or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (citation and internal quotation marks omitted); *see also Wyeth v. Levine,* 555 U.S. 555, 129 S.Ct. 1187, 1193–94, 173 L.Ed.2d 51 (2009). Here, there is no conflict. The simple duties prescribed by California Civil Code § 2923.6 are not requirements or prohibitions of the sort that section 560.2 of HOLA pre-empts. That section pre-empts (1) state laws that (2) either purport to regulate federal savings associations or otherwise materially affect their credit activities. The duties to simply provide a single contact person to a distressed borrower and not to engage in "dual

tracking" (continuing foreclosure process while review a mortgage lender for a loan modification) which the basis for Plaintiff's claims do not materially affect credit activities of federal savings banks. It is not impossible to comply with both HOLA and California Civil Code § 2923.6.

Third, there can be presumption against pre-emption which applies here. When "Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth vs. Levine, 129 S.Ct. 1887 (2009),* at 1194–95. Defendant Wells Fargo is required to demonstrate "a conflict between a particular local provision and the federal scheme, that is strong enough to overcome the presumption that state and local regulation matters can constitutionally coexist with federal regulation." *Hillsborough County,* 471 U.S. at 716, 105 S.Ct. 2371; *see also Geier v. Am. Honda Motor Co., Inc.,* 529 U.S. 861, 885, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). Here, because the *process of foreclosure* has traditionally been a matter of state real property law, a point noted both by the United States Supreme Court in *BFP v. Resolution Trust Corp.* (1994) 511 U.S. 531, 541–542, 114 S.Ct. 1757, 128 L.Ed.2d 556, then the presumption against pre-emption applies and Defendant Wells Fargo is required to show a conflict between HOLA and the requirements of California Civil Code § 2923.6 is so strong as to overcome the presumption that California Civil Code § 2923.6 can constitutionally coexist with HOLA. Defendants Wells Fargo could not do that.

Finally, as the court stated in *Mabry vs. Superior Court,* "[b]y contrast, we have not been cited to anything in the federal regulations that governs such things as initiation of foreclosure, notice of foreclosure sales, allowable times until foreclosure, or redemption periods. Given the traditional state control over mortgage foreclosure

laws, it is logical to conclude that if the Office of Thrift Supervision wanted to include foreclosure as within the preempted category of *loan servicing,* it would have been explicit. Nothing prevented the office from simply adding the words "foreclosure of" to section 560.2(b)(10)." *Mabry v. Superior Court*, 185 Cal. App. 4th 208, 231, 110 Cal. Rptr. 3d 201, 218 (2010)

Therefore, Plaintiffs' claims stated in their Second Amended Complaint are not preempted by HOLA.

**C.**   **THE SECOND AMENDED COMPLAINT STATES A CLAIM FOR VIOLATION OF CAL. CIV. CODE § 2923.6**

Plaintiffs' Second Amended Complaint states a claim for violation of California Civil Code § 2923.6. Signed into law on July 11, 2012 and effective January 1, 2013, the California Homeowner's Bill of Rights specifically prohibits the practice commonly known as "Dual Track Foreclosure," whereby lenders and loan servicers continue to advance the foreclosure process with respect to borrowers whose loans are simultaneously being reviewed for modification eligibility.

California Civil Code Section 2923.6 has now been amended to reflect this prohibition.  Section 2923.6(c) now reads: "If a borrower submits a complete application for a first lien loan modification offered by, or through, the borrower's mortgage servicer, a mortgagee, trustee, beneficiary, or authorized agent shall not record a notice of default or notice of sale, or conduct a trustee's sale, while the complete first lien loan modification application is pending."  As amended, the California Civil Code also provides borrowers with a post-foreclosure cause of action to recover actual damages or, upon a court's finding of willful, reckless and/or intentional material violation, treble damages or statutory damages of $50,000.00, whichever is greater.[1]

---

[1] Cal. Civ. Code §§ 2924.12(b), 2924.19(b).

California Civil Code 2923.6(c)(1) further provides that a mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent shall not record a notice of default or notice of sale or conduct a trustee's sale until the "[m]ortgage servicer makes a written determination that the borrower is not eligible for a first lien loan modification, and any appeal period pursuant to subdivision (d) has expired." Subdivision (d) of Section 2923.6 provides 30 days from the date of a written denial for a borrower to appeal the decision denying a loan modification.

Here, ***Wells Fargo owned both the first and second lien on the subject property*** and conducted a modification review of both the first and second lien, meaning that Cal. Civ. Code §2923.6 applied and protected the Plaintiffs from Wells Fargo exercising the foreclosure power.  When the property sold at foreclosure sale, there was approximately $146,131.00 in equity in the property, meaning that the Plaintiffs were exactly the type of borrowers identified by the legislative intent in Cal. Civ. Code §2923.6(a).  Wells Fargo was never in danger of losing a cent on the first or second lien on the subject property, and it was in the interest of Wells Fargo, Plaintiffs and the loans' investors for Wells Fargo to offer a workout instead of exercising the power of foreclosure. SAC ¶ 46.

The fact that Wells Fargo proceeded with foreclosure on the second lien, despite Plaintiffs' active attempts to cure the default on the second lien is evidence that Wells Fargo intentionally sought to circumvent the new Homeowners Bill of Rights and to deny borrowers rights under the new law.  As the legislature states in Cal. Civ. Code §2923.6(a), it is the legislature's desire that a workout be offered where the profit of a workout would exceed that of foreclosure, and the remainder of §2923.6 establishes that the legislature believes the best way to achieve this goal is to ensure that the modification review process is not interrupted by the same party executing the review simultaneously exercising its power of foreclosure.

This is what happened here.  ***Wells Fargo was in control of the modification review process, and it simultaneously exercised the power of foreclosure; this is the definition of Dual Tracking, which is expressly prohibited under §2923.6***.  SAC ¶ 47.

As such, Defendant Wells Fargo's actions are in clear violation of the HBR's restrictions on dual tracking, its requirement of a single point of contact, as well as its mandatory written denial and appeal procedures.  Promptly, upon each of its numerous requests, Wells Fargo received all necessary documentation from Plaintiffs over the course of eleven months; any stated deficiencies were likewise corrected in a timely manner.  Plaintiffs' request for a loan modification was apparently never denied; in fact, upon each of Plaintiffs' diligent status inquiries, they were instead referred to a case manager who not only mismanaged their application, but who routinely vanished in the months leading up to the March 4, 2013 Trustee's Sale. SAC ¶ 49.

Therefore, Plaintiffs alleged sufficient facts to state their cause of action for violation of California Civil Code § 2923.6.

**D.**　　**THE SECOND AMENDED COMPLAINT STATES A CLAIM FOR PROMISSORY ESTOPPEL**

Plaintiffs and Wells Fargo began actively negotiating a revised payment plan; all the while, Wells Fargo's representatives assured Plaintiffs that, as a party entitled to foreclose upon the subject property in the event of default, Wells Fargo would refrain from doing so until a loan modification review was in process. SAC ¶ 52. Further, to the extent these assurances were made to them by Wells Fargo's employees, within the course and scope of such employment, they can be viewed as having been made on behalf of Wells Fargo, as a principal.  See, e.g., Cal. Civ. Code §2334 ("[a] principal is bound by acts of his agent. . .to those persons only who have

in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof"); See also Restatement (Third) of Agency §6.11 (2006).

Courts have found that an oral promise to postpone a foreclosure sale is sufficient to sustain a claim for promissory estoppel. See, e.g., *Garcia v. World Savings Bank* (2010) 183 Cal.App.4th 1031 (borrowers' material change of position, based upon lender's oral promise to postpone foreclosure sale, held sufficient to sustain a claim for promissory estoppel). In addition, the holding in *Aceves v. U.S. Bank*, 192 Cal.App.4th 218 (2011) is controlling here. In *Aceves*, the Court of Appeal, Second District, reviewed a trial court ruling sustaining a motion to dismiss without leave to amend that involved facts strikingly similar to the facts here. The lending bank promised to work with the plaintiff in *Aceves* but the bank did not work in good faith to develop a debt modification plan. After the plaintiff there lost her house, she sued the bank alleging a cause of action for promissory estoppel.  The trial court sustained bank's motion to dismiss without leave to amend but on appeal, the court of appeal, reversed, holding that all the essential elements were satisfied: (1) the bank promised to work on a plan to modify the repayment terms so as to avoid foreclosure; (2) the plaintiff relied on the promise by not seeking alternative methods to save her home from foreclosure; (3) plaintiff's reliance was reasonable and foreseeable; and (4) the plaintiff relied on the bank's promise to her detriment. *Aceves*, 192 Cal.App.4th at 228-229. The *Aceves* court emphasized that "the question . . . is simply whether U.S. Bank made and kept a promise to negotiate with Aceves, not whether . . . the bank promised to make a loan or, more precisely, to modify a loan." *Aceves*, 192 Cal.App.4th at 226.

Here, Plaintiffs' Second Amended Complaint unambiguously alleged that Defendant Wells Fargo, through its employees and/or agents, represented that foreclosure would not be instituted until a determination was made as to Plaintiffs'

eligibility for a loan modification. More specifically, as set forth at length in the factual summary above, Mr. Teran provided Plaintiffs with numerous assurances that he would submit their HAMP application for review, that in light of their clear eligibility, a loan modification was forthcoming and that no foreclosure sale would take place during their evaluation.  Statements to this effect were made on April 18, 2012; May 8, 2012; May 15, 2012; May 17, 2012; June 18, 2012; June 20, 2012; September and November, 2012; February 4, 2013; and March 1, 2013. Taken together, these assurances constituted continuing promises to submit and consider Plaintiff's application, and in addition, to refrain from pursuing foreclosure while their application was under review and pending approval. SAC ¶ 52.

Wells Fargo should have reasonably expected that Plaintiffs would rely on this promise, being a bona fide company. SAC ¶ 54. In addition, as to whether Plaintiffs' reliance was "reasonable," such a question is not appropriate for resolution at so early a stage in this litigation, and more importantly, Plaintiffs' reasonableness is simply not a matter to be determined and disposed of on the basis of defendant's self-serving assertions.  *See, e.g. Advanced Choices, Inc. v. State Dept. of Health Services* (2010) 182 Cal.App.4th 1661, 1671-72.

Plaintiffs did in fact rely on these representations by completing a loan modification application and submitting all requested documentation, instead of pursuing alternative courses of action in order to avoid foreclosure including, but not limited to, further refinancing with another lender, marketing and selling the subject property, or filing a petition under Chapters 7 or 13 of the United States Bankruptcy Code, any one of which would have been a viable option. SAC ¶ 55. And as a direct and proximate result of Wells Fargo's conduct, Plaintiffs have suffered, and continue to suffer, general and special damages in an amount to be determined at the trial of this action. SAC ¶ 56.

As such, the Court should deny, again, Wells Fargo's Motion to Dismiss Plaintiffs' claim for promissory estoppel; alternatively, if the Motion to Dismiss is sustained, the Court should grant leave to amend SAC in order to address any and all of its concerns in this respect.

**E.**   **THE SECOND AMENDED COMPLAINT STATES A CLAIM FOR NEGLIGENCE**

The elements of a negligence cause of action are (1) the existence of a duty to exercise due care, (2) breach of that duty, (3) causation, and (4) damages. *See Merrill v. Navegar, Inc.,* 26 Cal.4th 465, at 500, 110 Cal.Rptr.2d 370, 28 P.3d 116 (2001).

"[A]s a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." *Nymark v. Heart Fed. Sav. & Loan Ass'n,* 231 Cal. App. 3d 1089, at 1096, 283 Cal. Rptr. 53 (1991) (internal citations omitted). However, district courts have found that a lender may owe a general duty of care sufficient to support a negligence claim. *See Ansanelli v. JP Morgan Chase Bank, N.A.,* 2011 WL 1134451, at 7 (N.D. Cal. March 28, 2011) (a lender may owe a duty of care when the lender goes "beyond its role as a silent lender and loan servicer to offer an opportunity to plaintiffs for loan modification and to engage with them concerning the trial period plan."); *Osei v. Countrywide Loans*, 692 F. Supp. 2d 1240 (E.D. Cal. 2010) ("[a] lender may owe a duty of care sounding in negligence to a borrower when the lender's activities exceed those of a conventional lender.") In addition, this Court should not ignore the very recent decision of the Court of Appeals of California in *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal. App. 4th 872. After a thorough discussion of the general 'no duty rule' and recent changes in policy of finding some duty on lenders, the Court of Appeals

concluded that "the determination that Chase owed no duty to Jolley was error." *Id.* at 906.

Moreover, district courts in California have held that a loan servicer may owe a duty of care in certain circumstances. *See, e.g., Susilo v. Wells Fargo Bank, N.A.,* 796 F. Supp. 2d 1177, at 1187-88 (C.D. Cal. 2011) (servicer owed duty of care to disclose reinstatement amount to plaintiff); *Gardner v. American Home Mortg. Serv., Inc.,* 691 F. Supp. 2d 1192, at 1199 (E.D. Cal 2010) (servicer owed duty not to accept payments to which it was not entitled).

Under certain circumstances, a lender may owe a duty of care to a borrower in the context of a particular transaction. *Nymark,* 231 Cal. App. 3d at 1093. In determining whether a duty of care existed, courts consider the following factors: (1) the extent to which the transaction intended to affect the plaintiffs; (2) the foreseeability of harm to them; (3) the degree of certainty that the plaintiffs suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury suffered; (5) the moral blame attached to the defendant's conduct; and (6) the policy of preventing future harm. *Id.* at 1098 (citing *Biakanja v. Irving*, 49 Cal.2d 647, at 650, 320 P.2d 16, at 19 (1958)).

In *Garcia,* the district court applied this test to find that the defendant owed a duty of care in processing the plaintiff's loan modification application. *Garcia v. Ocwen Loan Servicing, LLC,* 2010 WL 1881098 at 8. There, the borrower plaintiff applied to the lender defendant for loan modification. *Id.* at 1. The defendant asked the plaintiff to submit various documents in connection with the loan modification request. *Id.* The plaintiff did so, but upon receiving the documents, the defendant routed them to the wrong department. *Id.* For the next several weeks, the plaintiff's agent repeatedly tried to contact the defendant to determine which documents were missing, but he was unable to speak with any of the defendant's employees until the

plaintiff's house was sold at a trustee's sale. *Id.* The court found that "by asking Plaintiff to submit supporting documentation, Defendant undertook the activity of processing Plaintiff's loan modification request. Having undertaken that task, it owed Plaintiff a duty to exercise ordinary care in carrying out that task." *Id.* at 4.

As in *Garcia,* application of the *Nymark* test to the facts of the current case leads to the same result. Here, Defendant Wells Fargo advised Plaintiff to stop paying his mortgage payments in order to be considered for a loan modification and engaged Plaintiffs in loan modification process asking them to send documents and promising to postpone the trustee sale. SAC ¶¶ 13-38. First, the loan modification transaction was "intended to affect" Plaintiffs because a result on the loan modification application would have determined whether they could keep their Property. Plaintiffs were the parties in direct communication with Defendant Wells Fargo. Second, it was foreseeable that unless Plaintiffs had an opportunity to modify their loan, they would lose their home at the Trustee's Sale. Third, Defendants' mishandling the loan modification request and failure to postpone the trustee's sale as promised resulted in the loss of Plaintiff's Property. Fifth, after the recent years of economic recession connected with the real estate market troubles of all sorts, banks can hardly avoid blame for their handling of mortgage loans. Sixth, there is clear public policy of helping homeowners caught in the foreclosure crisis on the federal level (*See* "Making Home Affordable Program" at MakingHomeAffordable.gov) and preventing negligent conduct during loan modification process on the state level (*See* "Homeowners Bill of Rights," codified in California Civil Code, Section 2923.6). There may be no duty on lenders to grant loan modifications, but there is a duty on Defendant Wells Fargo to act in a reasonable manner as any other reasonable person in handling Plaintiffs' loan modification process.

1    Defendant Wells Fargo breached its duty of care to Plaintiffs by advising them
2    to stop paying their mortgage payments, by failing to postpone the Trustee's Sale and
3    by failing to provide a fair loan modification process in accordance with California
4    laws. Defendants' breach caused Plaintiffs to lose their opportunity to have their loan
5    modified and save their Property from the Trustee's Sale. Plaintiffs' Property was
6    sold at the Trustee's Sale.
7        Therefore, because Wells Fargo owed duty of care to Plaintiffs and breached
8    such duty causing Plaintiffs to lose their Home, Plaintiffs have sufficiently alleged a
9    cause of action for negligence.

## IV.    CONCLUSION

11       Plaintiffs' Second Amended Complaint  is well-pled and allows the Court to
12   infer more than the mere possibility that Plaintiffs are entitled to relief; in fact, when
13   the Court accepts the factual allegations  as true the Court can make a "reasonable
14   inference" that Defendant Wells Fargo engaged in misconduct for which it may be
15   liable. Therefore, Plaintiffs respectfully request that the Court DENY Wells Fargo's
16   Motion to Dismiss in its entirety.
17       To the extent the Court dismisses any of Plaintiffs' claim or allegation,
18   Plaintiffs request the opportunity to amend their pleading to cure any deficiency, add
19   any additional causes of action and/or rename any causes of action.
20   DATED: January 23, 2014                    THE ALBERTS FIRM

22                                  By:    /Batkhand Zoljargal/
23                                         Jeremy J. Alberts
                                           Batkhand Zoljargal,
24                                         Attorneys for Plaintiffs,
25                                         Manoj Rijhwani and
                                           Lisa Rijhwani

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED
COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**